# EXHIBIT D

Boston Police Department Rules and Procedures            Rule 303      April 11, 2003

 

USE OF DEADLY FORCE

INTRODUCTION

This rule is issued to provide guidelines and regulations governing the use of deadly force by members of the Department, to ensure the safety of our police officers and the public, and to establish procedures for the orderly investigation of firearm discharges. Its provisions are effective immediately, superseding all previously issued rules, regulations, orders, bulletins and directives regarding the use of deadly force by Boston police officers.

In the establishing of these regulations it is understood that they will not likely cover every conceivable situation which may arise. In such situations officers are expected to act with intelligence and sound judgment, attending to the spirit of the rule. Any deviations from the provisions of Sections 5, 6, 7, or 8 of this rule shall be examined on a case by case basis.

Note: Weapons and ammunition coming into the custody of Police Department personnel shall be handled in accordance with the provisions of Rule No. 311, Procedures for Handling Firearms Evidence.

Sec. 1 Definitions: For the purpose of this rule, the following definitions will apply:

Deadly Force is that degree of force likely to result in death or great bodily injury. The discharge of a firearm toward a person constitutes the use of deadly force even if there is no express intent to kill or cause great bodily injury.

Great bodily injury means bodily injury which creates a substantial risk of death or which is likely to cause serious injury, permanent disfigurement or loss, or extended impairment of the function of any bodily member or organ.

Immediate danger of death or great bodily injury includes circumstances under which (1)

such a danger exists in reality, or (2) such a danger is apparent, and the officer is unable to affirm or disaffirm its actual existence.

Prudence means using cautious, discreet or shrewd action and having due regard for the rights of citizens while maintaining an awareness of the responsibilities of acting as a police officer.

Reasonableness is moderate and/or fair action within reason, suitable to the confrontation.

The Investigating Officer in Charge (IOIC) is the Detective Superior Officer of the Firearm Discharge Investigation Team so designated by the Commander of the Homicide Unit and assigned to investigate the facts of the incident and to determine the justification for the use of deadly force.

Sec. 2 General Considerations: The primary purpose for which a sworn member of the Department is issued a firearm and trained in its use is the protection of life and limb, both theirs and that of every other person needing such protection. Although the firearm is a necessary weapon for present-day policing, its potential to inflict death or great bodily injury mandates that it be used with discrimination and within clearly-defined limits. This rule establishes those limits.

In the interests of personal safety, police officers must seek to gain and maintain an advantage over persons known or suspected to be armed. Such an "edge" may take the form of numerical superiority in manpower and firepower or of an officer staying "one jump ahead" of a subject likely to produce a weapon. Officers seeking to maintain the advantage over a subject suspected of being armed are in a difficult position; they must be prepared to use a firearm should it be necessary, yet show the restraint required to ensure the propriety of their actions. The situation demands the utmost ability to think clearly, quickly and decisively and to use the firearm in a safe and effective manner.

The Boston Police Department recognizes its legal duty to protect the rights of all individuals to due process of law and a fair trial. Its members are thereby bound to refrain from any use of force that unnecessarily tends to administer punishment at the hands of a police officer. The responsibility for punishment of criminal offenders rests solely with duly constituted courts of law and penal institutions and is by no means extended to the police.

Sec. 3 Training and Qualification: Police officers in this Department will be held accountable for proficiency as well as compliance with Department policy in the use of firearms. All sworn members of the Department are responsible for maintaining a degree of expertise in the use and handling of all firearms approved for their carrying. Specifically, sworn members authorized to carry a firearm shall qualify with their issued firearm(s) on a course of instruction approved by the Massachusetts Criminal Justice Training Council at least twice each year - once during the period from January 1st - June 30th and once during the period from July 1st - December 31st. A qualifying score of 80% or higher is required. When members of the Department are issued a new weapon, they shall qualify at the Department range in the use of that weapon prior to resuming street duties. This shall not apply to the emergency use of a comparable spare weapon issued on a temporary basis.

In the event an officer fails to qualify, the officer will be temporarily re-assigned to the Department Range. It will be the responsibility of the Commanding Officer of the Department Range to ensure that the officer's firearm is taken from them until such qualification is achieved. Any officer who, after such intensive training as determined by the Commanding Officer of the Department Range, has still failed to qualify will be subject to reevaluation as to their fitness to continue to perform the duties of a police officer. Under no conditions shall an officer who fails to qualify be allowed to perform any street police duties.

Frequently, officers have activated themselves during off-duty situations where there is a need to draw a personal firearm and the possibility exists to use such weapon. On self activation, the officer's actions are guided by all Departmental rules and regulations, hence there is a need to show familiarization with any personal weapon which is carried while off-duty.

Members of the Department who are licensed to carry firearms pursuant to M.G.L. c. 140, § 131 and who own and carry a personal firearm while off-duty shall fire a familiarization course as designed by the Commanding Officer of the Department Range. This course will be fired during regular qualification times and police officers shall provide their own ammunition.

Officers complying with this portion of the rule will notify their Commanding Officer of their intent to do so and shall be authorized to carry more than one weapon while on duty for the sole purpose of attending the familiarization course at the Department Range. This authorization shall be temporary and will only allow the officer to carry the off-duty weapon to and from the range. The off-duty weapon shall be secured in the District gun locker prior and subsequent to completion of the familiarization course.

Sec. 4 Security and Maintenance of Department Firearms: Members of the force shall take all reasonable precautions to insure that weapons issued to them by the Department are protected from loss, misuse or theft.

Members are responsible for keeping their issued weapons clean and in good working order. A weapon which malfunctions shall be returned to the Boston Police Range forthwith.

Sec. 5 Pointing Firearms: Officers shall not point firearms at persons except when reasonably justified under the circumstances. In situations involving the strong possibility of great danger (e.g. searching a building pursuant to a burglar alarm or approaching a business establishment on a report of a robbery in progress, etc.) officers should carry their weapon in a position that will facilitate its speedy and safe use. While officers should not point a weapon unless they are prepared to use it, the fact that they have done so must not be interpreted as an obligation to fire.

Sec. 6 Discharge of Firearms: The law permits police officers to use reasonable force in the performance of their duties but only to the degree required to overcome unlawful resistance. This doctrine of "reasonable use of force" applies to the use of firearms as well as to non-lethal force. Also, because of their destructive potential, the use of firearms must be further restricted to the purpose for which they are issued, that of protecting life and limb. The discharge of a firearm by a member of the Department is permissible only when:

A. There is no less drastic means available to defend oneself or another from unlawful attack which an officer has reasonable cause to believe could result in death or great bodily injury, or

B. There is no less drastic means available to apprehend a fleeing felon when the officer has probable cause to believe that: (1) the subject has committed a felony during the commission of which they inflicted or threatened to inflict deadly force upon the victim, or (2) that there is substantial risk that the felon in question will cause death or great bodily injury if their apprehension is delayed, or

C. There is no less drastic means available to kill a dangerous animal or one so badly injured that humanity requires its removal from further suffering.

Officers who find it necessary, under the provisions of this rule, to discharge firearms shall exercise due care for the safety of persons and property in the area and shall fire only when reasonably certain that there is no substantial risk to bystanders.

Sec. 7 Warning Shots and Signals: Firearms shall not be used as a signaling device. A firearm shall not be used to summon assistance or to give signals or to warn a fleeing felon to stop. This does not mean that officers may not discharge their firearm without the intent to kill or disable if in their best judgment there is no alternate method of convincing a would-be attacker that they are ready and able to defend themselves or others if the potential threat is not discontinued.

Sec. 8 Moving/Fleeing Vehicles: Firearms shall not be discharged from a moving vehicle. Firearms shall not be discharged at a moving or fleeing vehicle unless the officer or another person is currently being threatened with deadly force by means other than the moving vehicle. For the purposes of this section, the moving vehicle itself shall not constitute the threatened use of deadly force. Therefore, officers shall move out of the path of any oncoming vehicle instead of discharging a firearm at it or any of its occupants. Moving to cover, repositioning and/or waiting for additional responding units to gain and maintain a tactically superior police advantage maximizes officer safety and minimizes the necessity for using deadly force.

The above prohibitions exist for three reasons:

1. Bullets fired at moving motor vehicles are extremely unlikely to stop or disable the motor vehicle,

2. Bullets fired may miss the intended target or ricochet and cause injury to officers or other innocent persons, and

3. The vehicle may crash and cause injury to officers or other innocent persons if the bullets disable the operator.

Sec. 9 Permissible Weapons, Magazines and Ammunition:  Officers shall carry on duty only weapons, magazines and ammunition authorized and issued by the Department. Officers must carry all weapons with a fully loaded magazine, in addition to having one round in the chamber.  Officers shall keep spare magazines fully loaded.  Approved Department weapons, and their respective magazine capacities, include, but are not limited to:

- Glock Model 22 – 15 Rounds
- Glock Model 23 – 13 Rounds
- Glock Model 27 – 9 Rounds with flat floorplate, 10 rounds with extended floorplate
- Sigarms .45 Caliber Pistol – 8 Rounds – Officers shall carry this weapon with the manual safety engaged at all times, except just prior to discharge, or if necessary to disengage the safety to facilitate the loading and unloading process

Regardless of whether an officer is on duty or off duty, an officer may only carry a Department issued weapon on his/her person in a Department issued or Department authorized holster.

The Department may selectively issue other weapons to qualified personnel, if they are deemed necessary to ensure the safety and effectiveness of police operations. Officers armed with such weapons shall use those weapons in accordance with the provisions of this rule as well as any additional guidelines given at the time of issuance.

No police officer shall accept a Department issued weapon unless he/she has qualified in its proper use. No Superior Officer shall issue a Department weapon to any other officer without first asking if the officer is qualified in its use.

A Department armorer or a Department approved armorer, at the discretion of the Commanding Officer of the Boston Police Range, are the only persons allowed to perform all repairs or modifications to Department issued firearms, magazines or other weapons.

Sec. 10 Reporting Firearms Discharges: All firearm discharges, except discharges which occur during Department authorized or approved firearms training, while lawfully engaged in target practice or while hunting (unless a discharge occurring during one of these three exceptions results in death, personal injury or property damage), require the submission of an incident report (1.1) which includes information relative to injuries and damage to property.

- An officer who discharges his firearm during the course of his duties shall immediately notify the Operations Division that they have been involved in a "Code 303" and request that a Patrol Supervisor respond to the scene. The officer shall make a verbal report of the discharge to the responding Patrol Supervisor. In the event that someone has been injured, officers will request medical assistance. The supervisor shall request that Operations make all appropriate notifications including the Firearm Discharge Investigation Team. A full written report of the discharge must then be made prior to the termination of the officer's tour of duty, unless medical reasons dictate that the report be made at a later date.

- An off-duty officer discharging a firearm in the City of Boston shall immediately notify an Operations Division Supervisor. The Operations Division shall notify the Officer in Charge of the District in which the discharge took place and the Firearm Discharge Investigation Team. The officer involved in the firearm discharge shall submit the necessary reports without delay to a Superior Officer assigned to the Firearm Discharge Investigation Team. The Officer in Charge of the District in which the discharge took place shall notify the off-duty officer's Commanding Officer.

- An officer who discharges a weapon outside of the City of Boston shall immediately notify and make a report of the discharge to the Police Department which has jurisdiction where the discharge occurred, identify themselves as being a Boston police officer and notify an Operations Division Supervisor as soon as possible. The Operations Division shall immediately notify the officer's Commanding Officer and the Firearm Discharge Investigation Team. Officers who have discharged a firearm shall complete a BPD Form 2415 (Firearms Discharge Report) in its entirety.

Sec. 11 Investigation of Firearm Discharges: The manner in which police officers use firearms is an extremely critical issue to the Department, one in which the community and the courts allow little margin for error. To insure that proper control in this area is maintained, all reported discharges of firearms by officers of this Department will be thoroughly investigated by the Firearm Discharge Investigation Team.

The Firearm Discharge Investigation Team has sole responsibility for investigating firearm discharges involving a member of the Department. Failure to cooperate with the investigation shall be grounds for disciplinary action. The foregoing does not prevent an officer from exercising their constitutionally protected rights to remain silent or to speak with legal counsel.

The District Commander of the District wherein a police officer discharges a firearm shall be responsible for assigning a Superior Officer to assist the Firearm Discharge Investigation Team in their investigation into the discharge.

In those incidents where the use of deadly force results in death, the District Attorney's Office, pursuant to the terms of M.G.L. c. 38, § 4, will assume control of the investigation. The statute reads, in part, "The District Attorney or his law enforcement representative shall direct and control the investigation of the death and shall coordinate the investigation with the office of the chief medical examiner and the police department within whose jurisdiction the death occurred."

In all instances where a Boston police officer discharges a firearm resulting in injury, the District Attorney's Office will be notified and his designees from the Boston Police Department will conduct an independent investigation to determine the facts of the case.

Responsibilities: Patrol Supervisor

Shall respond immediately to a reported use of deadly force, Code 303, within his District and assume command of the investigation pending the arrival the District Commander and/or the Firearm Discharge Investigation Team.

Shall notify the Operations Division of the firearm discharge. In turn, the Operations Division shall be responsible for making all necessary notifications.

Shall initiate such preliminary steps as are necessary to conduct a thorough investigation and hold himself in readiness to assist the District Commander and the Firearm Discharge Investigation Team upon their arrival. In this respect, the Patrol Supervisor shall have the authority to order as many units to the scene of the firearms discharge as is deemed necessary or to take any other appropriate action to complete the task.

Shall establish an outside perimeter around the area of the incident.

Shall ensure that the scene is preserved pending the arrival of the Firearm Discharge Investigation Team in a manner pursuant to Rule 309, Procedures for Handling Physical Evidence and Other Property Coming into Police Custody.

Shall take possession of the firearm which has been discharged and ensure that it is turned over to the Department Ballistician as soon as possible. In so doing, the Patrol Supervisor shall preserve all firearms in the condition in which they are found. The Patrol Supervisor must use extraordinary care in this respect as the firearm may still be loaded.

In the event that more than one officer is present at a shooting incident, the Patrol Supervisor, as soon as circumstances allow, shall collect all firearms which belong to the officers who were at the scene and store them until a Department Ballistician can ascertain which have been fired. Firearms determined not to have been discharged will then be returned to the police officers to whom they were issued as soon as possible.

Responsibilities: District Commander

The District Commander will respond to the scene and assume overall command of the situation pending the arrival of the Firearm Discharge Investigation Team. Additionally, the District Commander will:

Assign a Superior Officer to assist the Firearm Discharge Investigation Team and ensure that any and all District resources are made available to complete the investigation. The District Commander will have the flexibility to assign any Superior Officer to fulfill this task.

Ensure that full cooperation is extended to the Firearm Discharge Investigation Team and any designated investigators from the District Attorney's Office.

Responsibilities: Commander, Homicide Unit

Shall be responsible for ensuring that a Firearm Discharge Investigation Team is assigned to investigate all reported firearm discharges by Department personnel except discharges which occur during Department authorized or approved firearms training, while lawfully engaged in target practice or while hunting (unless a discharge occurring during one of these three exceptions results in death, personal injury or property damage).

The Commander, Homicide Unit shall have the flexibility and discretion to assign any investigators deemed appropriate as being members of the Firearm Discharge Investigation Team.

The Commander, Homicide Unit, shall have ultimate responsibility for ensuring the thoroughness of any investigation regarding a firearm discharge or the use of deadly force by Department personnel.

Responsibilities: Firearm Discharge Investigation Team

The Firearm Discharge Investigation Team shall respond to the scene as expeditiously as possible and immediately meet with the Patrol Supervisor and be briefed relative to the known facts surrounding the incident.

Shall notify the Operations Division that they are taking control of the scene and the investigation. Notifications must be done "on-air."

Shall be allowed any resources they deem necessary to conduct a complete investigation.

Shall conduct an investigation to determine the facts of the incident.

Shall ensure that a thorough search is conducted at the scene.

Shall ensure that witnesses are identified, separated and interviewed.

Shall coordinate with any other simultaneous investigations.

Shall submit a preliminary report within five (5) days to the Commander, Homicide Unit, to the Commander of the District or Unit where the officer is assigned and to the Commander of the District or Unit where the discharge occurred, to the Bureau Chief of the appropriate command and to the Superintendent-In-Chief. The Superior Officer in Charge of the Firearm Discharge Investigation Team shall make a recommendation in the preliminary report, based upon an assessment of the facts known, as to the justification for the use of deadly force, whether or not the firearms discharge was accidental and whether or not it involved personal injury, death or damage to personal property.

Pending this report, the Officer involved will be assigned to administrative duties in their unit of assignment. However, if the preliminary investigation indicates that the firearm

discharge was justified, the Officer may be restored to regular duties, with the approval of their Commanding Officer, the Bureau Chief of the appropriate command, the Superintendent-in-Chief and the concurrence of the Police Commissioner.

The Firearm Discharge Investigation Team shall submit a comprehensive, detailed report, with recommendations, within thirty (30) days to the Commander of the Homicide Unit and to the Superintendent-in-Chief. An extension may be granted to the thirty (30) day time frame with the permission of the Superintendent-In-Chief.

Sec. 12 Disposition: Upon receiving a report pertaining to a firearms discharge and investigation by the Firearm Discharge Investigation Team, the Superintendent-in-Chief may accept it or return the report with a request for further information or clarification. In every case, the authority and responsibility for final Departmental disposition of a firearms discharge incident rests solely with the Police Commissioner. Upon accepting a report and making a final disposition in a firearm discharge case, copies of the Police Commissioner's decision shall be sent to the appropriate District, Unit and Bureau Commanders.

Notes:
- Amend by SO-07-058, issued October 15, 2007 Section 9, Paragraph 1.
- Amended by SO 08-034, issued 09/12/2008, all references to the "Ballistics" or "Ballistics Unit" shall be amended to Firearms Analysis Unit. All references to the "Ballistician" or the "Department Ballistician" shall be amended to the Firearms Examiner. Section 10.

Boston Police Department Rules and Procedures        Rule 303A        June 22, 2000

 

USE OF LESS - LETHAL FORCE

This rule is issued to establish guidelines for the use of less-lethal force by members of this Department in the performance of their duties, and to establish appropriate training, reporting, and documentation for such use of force.

Sec. 1 DEFINITIONS:

1.1 Less-Lethal Force Philosophy is a concept of planning and force application that meets operational objectives, with less potential for causing death or serious physical injury than the use of deadly force.

1.2 Reasonableness is moderate and/or fair action within reason, suitable to the confrontation.

1.3 Super Sock Round, also known as a flexible projectile, is fired through a 12 gauge shotgun.

Sec. 2 GENERAL CONSIDERATIONS:

The Department has adopted the less-lethal force philosophy to assist in the de-escalation of potentially violent situations. The less-lethal force philosophy shall not preclude the use of deadly force.

Sec. 3 TRAINING AND QUALIFICATION:

Training shall consist of Department approved training and qualification program in the use of a 12 guage shotgun. Supervisors shall be trained and qualify four times per year in the proper use of a less lethal shotgun. Supervisors trained in the use of this weapon will be held accountable for proficiency as well as compliance with Department policy in the use of such weapon.

Sec. 4 SECURING OF LESS LETHAL SHOTGUN AND AMMUNITION:

Each less lethal shotgun shall be stored in a District gun locker in a safe condition (i.e. safety on, action open, chamber and magazine empty). Flexible projectile rounds shall be stored and secured along with the weapon in the District gun locker. The less lethal shotgun will have an orange colored stock. The words "less lethal" will be noted on the stock to identify that the less lethal shotgun is used strictly for flexible projectile rounds. Every Thursday the day tour Duty Supervisor shall perform a visual inspection to verify that the shotgun is stored in a safe condition, as well as insure that the requisite number of

flexible projectile rounds are accounted for. This information shall be recorded in a District Control Log.

During the Patrol Supervisor's tour of duty, the less lethal shotgun shall be loaded with four flexible projectile rounds in the magazine, with an empty chamber, with safety lock on, and secured in the locking device located in the trunk of the Patrol Supervisor's vehicle.

Sec. 5 AUTHORIZATION AND USE OF LESS LETHAL WEAPONS:

Only supervisors who have completed the Department training and qualification program shall be authorized to use a 12 guage less lethal shotgun.

If the possibility of the use of less lethal force is determined to be an option the Patrol Supervisor shall be notified and respond to the scene. If the possibility of the use of less lethal force is determined to be a reasonable option by the Patrol Supervisor, then the Patrol Supervisor shall notify the Boston Emergency Medical Services to respond.

The Patrol Supervisor shall designate an on-scene officer to provide lethal force coverage and, if deemed appropriate shall designate two or more officers for suspect take down.

Upon discharge of the shotgun the District Commander and Duty Supervisor shall be notified. Suspects who are struck by a flexible projectile round shall be transported to a medical facility for examination.

Sec. 6 REPORTING AND INVESTIGATION:

Any discharge of a less lethal shotgun other than training shall be investigated pursuant to Rule 303.

Boston Police Department Rules and Procedures          Rule 304      October 11, 1994

 

<u>USE OF NON-LETHAL FORCE</u>

This rule is issued to establish guidelines for the use of non-lethal force by members of this Department in the performance of their duties, and to establish appropriate training, reporting, and record keeping procedures for such use of force. Effective immediately, it supersedes all other rules, regulations, procedures, orders, bulletins, and directives issued previously regarding the use of non-lethal force by Boston police officers.

Because there are an unlimited number of possibilities, allowing for a wide variety of circumstances, no rule can offer definitive answers to every situation in which the use of non-lethal force might be appropriate. Rather, this rule will set certain specific guidelines and provide officers with a concrete basis on which to utilize sound judgment in making reasonable and prudent decisions, attending to the spirit over the letter of the rule.

Sec. 1 DEFINITIONS: For the purpose of this Rule the following definitions will apply:

1. Reasonable Amount of Force is the least amount of force that will permit officers to subdue or arrest a subject while still maintaining a high level of safety for themselves and the public.

2. Non-Lethal Force is that amount of force that will generally not result in serious bodily injury or death.

3. Prudence is cautious, discreet, or shrewd action having due regard for the rights of citizens while maintaining an awareness of the responsibilities of a police officer.

4. Reasonableness means within reason, moderate and/or fair action suitable to the confrontation. The final decision as to the prudence and reasonableness of a police action will be determined on a case by case basis by those members of the Department called upon to judge the propriety of a fellow officer's action. Such judgments may not conflict with the expressed provisions of this or any other rule or order.

Sec. 2 GENERAL CONSIDERATIONS: The policy of the Boston Police Department is to use only that amount of force that is reasonably necessary to overcome resistance in making an arrest or subduing an attacker.

The right to use non-lethal force is extended to police officers as an alternative in those situations where the potential for serious injury to an officer or civilian exists, but where the application of lethal force would be extreme.

The availability of a variety of non-lethal weapons is necessary to provide the police officer with a sufficient number of alternatives when presented with a physical confrontation. However, since such force will not likely result in serious injury and the close public scrutiny that accompanies the use of deadly force, this availability may also increase the possibility for overzealous and inappropriate use of force. Therefore, application of non-lethal force will generally be limited to defensive situations where (1) an officer or other person is attacked, or (2) an officer is met with physical resistance while making an arrest.

An officer may also use non-lethal force if, in the process of making an arrest, the officer is met with passive resistance, i.e., an individual who refuses to get out of an automobile, or a protester who is illegally occupying a particular place. Such force should be limited to the absolute minimum required to move the subject. An officer who encounters resistance should be assisted by any other officers present. Two or more officers may effect an arrest, without the use of force which one officer cannot complete without resorting to the use of force.

Sec. 3 TRAINING AND QUALIFICATION: Police officers in the Department will be held accountable for proficiency, as well as compliance with Department policy in the use of non-lethal force. Specifically, sworn members shall qualify by successfully completing the course of instruction on non-lethal force approved by the Training and Education Division. This course will be conducted as part of in-service training and will include a practical application segment and a written test component. Whenever the Department adopts new non-lethal force implements, officers will qualify in their use prior to carrying or using them on duty.

In the event that an officer fails to complete the required certification, the officer will be temporarily reassigned to the Academy. The Academy will then provide a remedial training program in order to ensure such certification. Officers who still fail to qualify will be subject to reevaluation as to their fitness to continue to perform the duties of a police officer.

Sec. 4 INCAPACITATING AGENT: Officers will carry only the type of incapacitating agent issued by the Department.

In electing to use an incapacitating agent against an armed subject, officers should understand that its effects are not uniformly predictable and certain individuals may remain undeterred by its application. Any such use should be accompanied by a realization that officers may need to take further action to ensure their safety. Conversely, all officers should be aware of the potential, however limited, for serious injury arising from the use of an incapacitating agent.

For this reason, officers should generally confine the use of incapacitating agents against armed or unarmed persons to the following situations:

1. In self defense or to defend another person against a violent physical assault.

2. When an officer, while making an arrest is met with vigorous physical resistance and is in danger of either being injured or of losing custody of the suspect.

Officers should be aware of the increased potential for serious injury to the suspect when incapacitating agents are used under the following circumstances:

1. When the subject is less than two feet away.

2. When the subject is in an enclosed area without ventilation.

3. When the subject lacks normal reflexes, such as the ability to blink, or is otherwise incapacitated.


When an incapacitating agent has been applied to a subject, officers should, upon securing the suspect, provide for the thorough dousing of the exposed areas with water as soon as is practicable. This should be done as soon as possible since the seriousness of any injury or burn is directly related to the length of time the exposed area remains untreated.

Sec. 5 SERVICE BATON AND SAPSTICK: The Department currently authorizes several baton-type implements for use as non-lethal weapons against assailants. Upon issuance to and qualification by an officer, the only baton-type implements authorized for that officer's use shall be their Department issued baton or, in the case of detectives and plain clothes officers who are in the performance of those specific duties, the lead-weighted flat sapstick.

The Department issued baton shall be the standard issue for all uniformed personnel and is to be worn on the equipment belt. The lead weighted flat sapstick will be allowed in place of the Department issued baton only for detectives and plainclothes officers, when they are performing those specific duties. In such case, only the flat sapstick is to be used, not the round billy.

The primary purpose of these weapons is to provide officers with an advantage when fending off and subduing an UNARMED assailant. Officers should not rely on these weapons to overcome an ARMED attack, since they are not intended for such use.

All officers should bear in mind the essentially defensive nature of the use of non-lethal force, as outlined above in General Considerations, Section 2, when using these weapons. Officers should use the defense oriented Pressure Point Control Tactic (PPCT) whenever possible in subduing a subject. This places primary emphasis on striking motor function

controlling nerve points in the body. Except in extreme situations, where the officer is in imminent danger of serious injury, no blows should be struck above the thigh, other than to the arms. Additionally, officers should be aware of the potential for permanent disability arising from a blow to the groin, and should limit such blows to extreme situations.

Sec. 6 INJURY TO SUSPECTS: The process of booking and jailing a suspect is often time consuming and confusing, allowing for the possibility of overlooking an injury that might have been brought about by police use of force. Indeed, many injuries may not be obvious even to the injured party. Such injuries, if left untreated, could result in serious problems for both the victim and the Department.

Therefore, this Department will have Emergency Medical Technicians examine all suspects who fall under either of these categories:

1. The suspect has an obvious injury, which in the opinion of the Duty Supervisor, requires treatment.

2. The suspect requests medical treatment for any injury, whether obvious or not.

Sec. 7 INVESTIGATION OF USE OF FORCE: This Department will thoroughly investigate every incident in which an officer strikes someone with any object or an incapacitating agent is used on a subject, or when a visible injury has occurred in the course of an arrest.

All such applications of force shall be immediately reported verbally to the involved member's patrol supervisor. By the end of the tour of duty, an officer who has used non-lethal force shall make out a written report describing the incident including the names of the officer and other persons concerned, the circumstances under which such force was used, the nature of any injury inflicted and the care given afterwards to the injured party.

Prior to the end of the tour of duty, the Patrol Supervisor shall conduct a thorough investigation on the use of such non-lethal force and submit a report to the Commanding Officer. Such report shall include the Patrol Supervisor's findings and recommendations based upon the assessment of facts known, as to the justification for the use of force. A complete Patrol Supervisor's investigation shall consist of the following, where appplicable:

1. Patrol Supervisor's investigative report;

2. A copy of the incident report, BPD Form 1.1;

3. Reports from the officer(s) alleged to have utilized non-lethal force;

4. Reports from all Department personnel that were present;

5. Reports on all interviews of civilian witnesses to the incident.

Page 4 of 5

At the discretion of the involved member's Commanding Officer, further investigation of the incident may be undertaken. Once all the facts have been compiled and substantiated, the Commanding Officer shall submit a report of the incident through channels to the Police Commissioner within seven (7) days.

Once the Police Commissioner indicates that the report and the associated investigation is satisfactory, copies of every such report shall be forwarded to the Bureau of Professional Standards and Development, the Human Resources Division and the Training and Education Division.

The Bureau of Professional Standards and Development and the Training & Education Division shall maintain a comprehensive file of all use of force reports. Further, the Bureau of Professional Standards and Development, acting on its own authority may, or at the request of the Police Commissioner shall, investigate all incidents involving the use of non-lethal force that, based on the information at hand, indicate non-compliance with Department policy.

The Bureau of Professional Standards and Development shall forward the results of all investigations undertaken to the Police Commissioner, who may accept it and act upon its recommendations, in total or in part, or return the report with a request for further information or clarification. In every case, the authority and responsibility for final departmental disposition of a Use of Non-Lethal Force incident rests solely with the Police Commissioner.

Note: Rule 304, issued by Special Order 94-37 on October 11, 1994, was amended by the issuance of Special Order 95-16, which made clear what constitutes a proper Patrol Supervisor's report (see section 7, para 3).

Notes:
- Amended by SO 07-016, issued April 2, 2007, update the organization names to reflect the new BPD organizational structures. Section 7.